# United States District Court
**for the**
**Western District of New York**

DEC 23 2009

United States of America )
)
v. ) Case No. 09-M- 220
)
MARK L. KAMHOLZ )
*Defendant* )

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

(1) Between in or about January 1, 2007, to in or about December 31, 2008, the exact date unknown, in the Western District of New York, the defendant, a person in charge of a facility, did knowingly fail to notify immediately the appropriate agency of the United States Government as soon as he had knowledge of a release of a hazardous substance in a quantity equal to or greater than that determined pursuant to section 9602 of Title 42 of the United States Code;

(2) From in or about January 1, 2007, the exact date unknown, to on or about December 17, 2009, in the Western District of New York, the defendant did knowingly store coal tar sludge, a hazardous waste identified and listed under the Resource Conservation and Recovery Act (RCRA), without a permit to store of such hazardous waste as required under RCRA; and

(3) From on or about April 14, 2009, to on or about December 17, 2009, in the Western District of New York, the defendant did knowingly violate a requirement of an operating permit promulgated and approved under section 7661a(a) of Title 42 of the United States Code;

all in violation of Title 42, United States Code, Sections 9603(b)(3), 6928(d)(2)(A), and 7413 (c)(1), respectively.

This criminal complaint is based on these facts:

**SEE ATTACHED AFFIDAVIT**

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

JUSTUS J. DERX, Special Agent, U.S. Environmental Protection Agency
*Printed name and title*

Sworn to before me and signed in my presence.

Date: December 23, 2009

[signature]
*Judge's signature*

City and state: Buffalo, New York

HONORABLE H. KENNETH SCHROEDER, JR., USMJ
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

**Justus J. Derx**, being duly sworn, deposes and states:

### I. BACKGROUND

1. I am a Special Agent with the United States Environmental Protection Agency (EPA), Criminal Investigation Division (CID), Syracuse, New York, and have been since December 1996. I have statutory law enforcement authority and I am authorized to obtain and execute arrest warrants. I have been a federal law enforcement officer for approximately 22 years. My duties as a Special Agent with EPA-CID include, among others, the investigation of criminal violations of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 et seq., the Resource Conservation and Recovery Act (RCRA), Title 42 United States Code, Sections 6901 et seq., and the Clean Air Act (CAA), Title 42, United States Code, Sections 7401 et. seq.

2. I make this affidavit in support of a criminal complaint charging MARK L. KAMHOLZ with violations of Title 42, United States Code, Sections 9603(b)(3) [CERCLA], 6928(d)(2)(A) [RCRA], and 7413 (c)(1) [CAA].

3. Title 42, United States Code, Section 9603(b)(3), states in pertinent part:

> Any person- in charge of a facility from which a hazardous substance is released, other than a federally permitted release, in a quantity equal to or greater than that determined pursuant to section 9602 of this title who fails to notify immediately the appropriate agency of the United States Government as soon as he has knowledge of such release ... shall, upon conviction, be fined in accordance with the applicable provisions of title 18 or imprisoned for not more than 3 years ... or both.

4. Title 42, United States Code, Section 6928(d)(2)(A), states in pertinent part: "Any person who- ... knowingly treats, stores, or disposes of any hazardous waste identified or listed under [RCRA] ... without a permit" shall be subject to a fine of not more than $50,000 for each day of violation or imprisonment not to exceed 5 years.

5. Title 42, United States Code, Section 7413 (c)(1), states in pertinent part: "Any person who knowingly violates any ... requirement of any ... permit promulgated or approved of this title (relating to permits) ... shall, upon conviction, be punished by a fine pursuant to title 18 or by imprisonment for not to exceed 5 years, or both." Title 42, United States Code, Section 7661a(a) states that "it shall be unlawful for any person to violate any requirement of a permit issued under this

subchapter, or to operate ... a major source ... except in compliance with a permit issued by a permitting authority under this subchapter."

6. In or about February of 1978, production operations began at the Tonawanda Coke Corporation ("TCC"), located at 3875 River Road, Tonawanda, New York. TCC operates as a merchant by-product coke facility whose products include foundry and furnace coke and whose by-products include coal tar and light oil. Pollution control and waste generation and management operations for TCC are regulated by environmental permits and regulations administered by EPA and the New York State Department of Environmental Conservation (NYS-DEC).

7. On December 17, 2009, your affiant assisted in the execution of a federally authorized search warrant at TCC. During the search warrant, KAMHOLZ was interviewed by NYS-DEC Investigator Robert O'Connor, and stated that he currently holds the title of Manager of Environmental Control at TCC. KAMHOLZ summarized his duties as maintaining the proper environmental permitting for the company, filing the necessary reports associated with the required permits, and striving to maintain compliance with the permits and environmental regulations.

KAMHOLZ stated that he had been employed at TCC since 1978, and that he reports directly to James D. Crane, the owner of TCC.

## II. THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT

8. The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 et seq., was enacted by Congress to address two significant aspects regarding hazardous waste: (i) the need for immediate notification and response for chemical releases, and (ii) the need for the cleanup and apportionment of liability for past and future chemical releases. Within this one Act, Congress addressed the notification, response, cleanup, and liability needs for chemical releases into all parts of the environment, including navigable water, groundwater, land, and air.

9. The most significant enforcement provision within CERCLA is contained at Title 42, United States Code, Section 9603(a), which states that the release of a reportable quantity of a hazardous substance from a facility into the environment requires immediate notification to the National Response Center, an agency within the Department of Homeland Security. Penalties for failure to report are contained in subsection (b).

10. A complete list of chemicals covered under CERCLA, and the reportable quantity associated with each chemical, are set forth in a table at Title 40, Code of Federal Regulations, Section 302.4. During the coke manufacturing process, TCC produces decanter tank tar sludge from coking operations (generally referred to as "coal tar sludge"). Coal tar sludge is a listed hazardous waste (K087), and is listed in the CERCLA table with a reportable quantity of 100 pounds.

11. On October 21, 2009, NYS-DEC Investigator O'Connor and EPA-CID SA Brian Kelly interviewed NYS-DEC Inspector Thomas Corbett regarding hazardous waste inspections he performed at TCC. During the interview, Inspector Corbett stated he, along with EPA employees, conducted a RCRA inspection at TCC on June 17, 2009, and September 10, 2009. During the June 17, 2009, inspection, Inspector Corbett stated that he observed two decommissioned storage tanks at TCC that appeared to contain coal tar sludge. Inspector Corbett also observed coal tar sludge that appeared to have spilled onto the ground around the two tanks. Inspector Corbett spoke with KAMHOLZ about the tanks. Specifically, KAMHOLZ told Inspector Corbett that the two tanks burned during a failed decommissioning two to three years ago, when the coal tar sludge was inadvertently ignited by cutting

torches. KAMHOLZ told Inspector Corbett that the tanks were being decommissioned for their scrap value. KAMHOLZ also told Inspector Corbett that the material in and around the tanks was coal tar sludge. During the June 17, 2009, inspection, Inspector Corbett took several photographs of the tanks, one of which is attached hereto as Exhibit A.

12. On December 9, 2009, your affiant reviewed a hazardous waste sampling inspection report relating to an inspection conducted by EPA Inspectors Robert Morrell, Stephan Hale and Leonard Grossman and NYS-DEC Inspector Tom Corbett at TCC on September 10, 2009. During that inspection, the two tanks discussed above that burned during a failed decommissioning attempt were again observed, photographed, and sampled. The September 10, 2009, inspection report states the tops to the two tanks had been cut off, and several feet of coal tar sludge remain in the bottom of these two tanks, exposed to the air. As part of the inspection, eight samples of the coal tar sludge were taken from the left tank and analyzed using the toxic characteristic leaching procedure (TCLP). The TCLP results indicate that all the samples exceed the TCLP regulatory level for benzene which is 0.5 mg/L. Specifically, the TCLP results

for the eight samples were as follows: 3.9, 1.7, 1.4, 1.1, 0.64, 2.1, 14.0, and 3.0 mg/L.

13. Your affiant was advised that on October 26, 2009, EPA-CID SA Kelly and NYS-DEC Investigator O'Connor, interviewed a TCC employee (hereinafter referred to as "Employee 1"). Employee 1 stated that TCC had previously decommissioned two coal tar storage tanks, and that during the decommissioning, the tanks caught fire and spilled coal tar onto the ground. Employee 1 stated that the tanks are still leaking and coal tar is still on the ground around the tanks.

14. On December 22, 2009, EPA-CID SA Kelly interviewed EPA Inspector Robert Morrell, concerning his inspection conducted at TCC on September 10, 2009. Inspector Morrell stated that based on his training, experience, and personal observations, the amount of coal tar sludge (K087) spilled outside of the two decommissioned tanks was well in excess of 100 pounds.

15. On December 22, 2009, your affiant reviewed data available through the National Response Center website. A query was conducted for all reported releases to the environment in Tonawanda, New York, for the period of December 31, 2006, to

present. A total of thirteen reported releases were reviewed, none of which involved the release of coal tar sludge (K087) or releases from TCC. Based on the job title and duties for KAMHOLZ, it would have been his responsibility to notify the National Response Center regarding the release of coal tar sludge during the failed decommissioning of the two tanks. Therefore, your affiant submits that there is probable cause to believe that KAMHOLZ failed to notify the National Response Center following the release of 100 pounds or more of coal tar sludge, in violation of Title 42, United States Code, Section 9603(b)(3).

**III. THE RESOURCE CONSERVATION AND RECOVERY ACT**

16. The Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., and the regulations promulgated thereunder (collectively "RCRA"), was enacted in 1976 as a response to the growing number of hazardous waste sites resulting from unregulated waste disposal practices. The objectives of RCRA include the protection of human health and the environment through strict regulation of the generation, treatment, storage, transportation and disposal of hazardous wastes. The statute creates a "cradle to grave" regulatory scheme that tracks hazardous wastes from their points of generation to the locations of their final dispositions. 42 U.S.C. §§ 6901 and 6902.

17. RCRA and its promulgated regulations define what constitutes "hazardous wastes." 42 U.S.C. § 6903; 40 C.F.R. § 261; 6 NYCRR § 371. In order for a waste to be considered a RCRA hazardous waste, it must be a "solid waste" that is also "hazardous." 42 U.S.C. § 6903(5) and (27). A "solid waste" under RCRA includes, among other things, "any garbage, refuse, sludge ... and other discarded material, including solid, liquid, semisolid, or contained gaseous materials resulting from industrial, commercial ... operations, and from community activities." 42 U.S.C. § 6903(27).

18. The coal tar sludge produced by TCC is regulated by RCRA as a listed hazardous waste (K087). Generally, coal tar sludge is excluded as a RCRA hazardous waste when it is recycled into the coke ovens. That exclusion is only valid provided the coal tar sludge is not land disposed of prior to recycling. Title 40, Code of Federal Regulations (C.F.R.), Section 261.4(a)(10).

19. As mentioned above, on June 17, 2009, and September 10, 2009, EPA and NYS-DEC inspectors observed coal tar sludge stored outside of the two tanks that burned during a failed decommissioning. During the execution of the search warrant on

December 17, 2009, your affiant observed that coal tar sludge, a RCRA hazardous waste, was still present in and around the two tanks that burned during the failed decommissioning attempt.

20. Your affiant is aware that TCC was never issued nor applied for a RCRA permit from the EPA or NYS-DEC regarding the storage of coal tar sludge. Based on the job title and duties for KAMHOLZ, it would have been his responsibility to obtain a permit from EPA or NYS-DEC to store the coal tar sludge. Therefore, your affiant submits that there is probable cause to believe that KAMHOLZ is storing coal tar sludge without a RCRA permit, in violation of Title 42, United States Code, Section 6928(d)(2)(A).

**IV. THE CLEAN AIR ACT**

21. The Clean Air Act, Title 42, United States Code (U.S.C.), § 7401 et seq., and the regulations promulgated hereunder (collectively "CAA"), is a comprehensive air pollution control statute that reflects the congressional purpose "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1).

22. Title V of the 1990 amendments to the Clean Air Act, 42 U.S.C. §§ 7661 et seq., created an operating permit program that regulates the emissions limits and compliance methods of stationary sources of air pollution (including TCC). Title V also requires sources to monitor and report whether they are operating in compliance with their permits. Title V was designed to put into a single operating permit all requirements that apply to a particular facility.

23. In New York, the "permitting authority" under Title V is the delegated air pollution control agency, NYS-DEC, which is authorized by EPA to carry out the permit program under Title V as codified in Title 40 of the Code of Federal Regulations. 40 C.F.R. § 70, Appendix A. The State of New York received interim approval of its program effective December 9, 1996. Id. New York was granted final full approval of its program effective January 31, 2002. Id. The New York regulations pertaining to Title V operating permits are set forth in Title 6 of the New York Codes, Rules and Regulations (NYCRR) Sub-parts 201-6. The United States retained its federal criminal enforcement authority under the CAA even after the EPA approved New York's State operating permit program under Title V. 42 U.S.C. § 7413.

24. Certain stationary sources are required to comply with the provisions of a Title V operation permit. 42 U.S.C. §§ 7661(2) and 7661a(a); 6 NYCRR § 201-6.1(a)(1). For coke by-product recovery plants and coke oven batteries that are stationary sources, a Title V operation permit is required, and incorporates the requirements set forth in 6 NYCRR, Part 214, 40 C.F.R., Part 61, subpart L, National Emission Standard for Benzene Emissions from Coke By-Product Recovery Plants, and 40 C.F.R., Part 63, subpart L, National Emission Standards for Coke Oven Batteries.

25. Each Title V permit includes, among other things, enforceable emissions limits and standards; a schedule of compliance; the permittee's consent to inspection and monitoring; and periodic submission of necessary monitoring data (at least once every six months). 42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a)&(c).

26. TCC was issued its current CAA Title V operating permit, permit number 9-1464-00113/00031, by NYS-DEC on April 30, 2002. The Title V permit expired on May 1, 2007; however, the permit has been administratively extended until a new Title V permit is issued by NYS-DEC because TCC submitted a timely Title

V air permit renewal application. KAMHOLZ is the listed contact for TCC on the Title V permit.

27. Your affiant has reviewed TCC's current CAA Title V operating permit, permit number 9-1464-00113/00031, which among other requirements, states on pages 82 and 83: "A person may not operate a wet quench tower of a coke oven battery unless it is equipped with a baffle system designed to effectively reduce particulate emissions during quenching." Baffles are pollution control devices that are used to disrupt airflow and entrap particulate matter before it is released to the atmosphere.

28. On December 21, 2009, NYS-DEC Investigator O'Connor interviewed NYS-DEC Air Pollution Control Engineer (CE) Larry Sitzman and CE Cheryl Webster regarding their knowledge of the use of baffles in the quench towers at TCC. During the interview, CE Sitzman and CE Webster stated that TCC has historically had two operational coke quenching towers at the facility. One quench tower is located to the west of the coke oven battery (hereinafter "quench tower 1") and the other quench tower is located to the east of the coke oven battery (hereinafter "quench tower 2"). CE Sitzman and CE Webster provided the following information regarding their interactions

with KAMHOLZ on the issue of the quench towers and baffles at TCC:

a. On December 29, 1996, KAMHOLZ sent NYS-DEC a letter requesting to modify the height of quench tower 2. In response, NYS-DEC sent KAMHOLZ a letter on January 6, 1997, granting permission to modify the height of quench tower 2, but included the following language: "It should be noted that Part 214.5(a) requires that all wet quench towers be equipped with a baffle system."

b. On July 11, 2003, KAMHOLZ sent a letter with an attached Hazardous Air Pollutant Emission Inventory Report to CE Sitzman. The Hazardous Air Pollutant Emission Inventory Report stated that particulate matter (PM) "emissions are a function of quench tower controls (i.e., use of baffles) and the quench water Total Dissolved Solids (TDS) level. The Tonawanda Coke quench tower has baffles for control of PM emissions."

c. During a Clean Air Act Compliance Inspection, conducted by EPA and NYS-DEC from April 14, 2009, to April 21, 2009, it was discovered that quench tower 2 did not have any baffles. Specifically, CE Webster recalled that on April 15, 2009, KAMHOLZ stated that there were no baffles in quench tower 2. KAMHOLZ then admitted to CE Sitzman that he was aware that the quench tower required baffles, and offered no explanation as to why there were no baffles in quench tower 2. On November 27, 2009, CE Sitzman received a letter from KAMHOLZ stating that baffles had been re-installed in quench tower 2, and that the installation was completed on November 16, 2009.

29. During the execution of the search warrant on December 17, 2009, your affiant observed that quench tower 1 and quench tower 2 appeared to be operational at TCC. Quench tower 1 did not have any baffles as required by TCC's Title V permit.

30. During the execution of the search warrant on December 17, 2009, NYS-DEC Investigator O'Connor and EPA-CID Special Agent (SA) Heath Martin interviewed an employee at TCC (hereinafter "Employee 2"). Employee 2 stated that quench tower 1 is used on a regular basis once or twice during each of the three shifts at TCC. Employee 2 further stated that quench tower 1 is used in order to keep the equipment operating properly, but that TCC has on occasion gone weeks without using quench tower 1 at all.

31. During the execution of the search warrant on December 17, 2009, EPA-CID SA Robert Conway interviewed an employee at TCC (hereinafter "Employee 3"), concerning the use of the quench towers. Employee 3 stated that TCC currently uses both quench towers in its operations. Employee 3 further stated that the quench tower containing baffles (quench tower 2) is used more often then the quench tower without the baffles (quench tower 1).

32. Based on the job title and duties for KAMHOLZ, it would have been his responsibility to ensure that baffles present in the wet quench towers used in the coking operation. Your affiant submits that there is probable cause that based on the operation of quench tower 1 and quench tower 2 without baffles, KAMHOLZ

violated the Title V permit for TCC, in violation of Title 42, United States Code, Section 7413 (c)(1).

## V. CONCLUSION

33. Based on the foregoing, your affiant respectfully submits that there is probable cause to believe that MARK L. KAMHOLZ has violated Title 42, United States Code, Sections 9603(b)(3), 6928(d)(2)(A), and 7413 (c)(1).

Justus J. Derx Special Agent
EPA Criminal Investigation Division

Sworn to and subscribed to before
me this 23th day of December 2009

HONORABLE H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE



Exhibit A