UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.                                        **DECISION AND ORDER**
                                                      10-CR-219S
TONAWANDA COKE CORPORATION and
MARK L. KAMHOLZ,

                        Defendants.

## I. INTRODUCTION

Presently before this Court are the parties' Motions in Limine. (Docket Nos. 88, 92, 108.) Counsel argued the motions on February 6, 2013, and this Court reserved decision at that time. For the reasons stated below, the motions are denied in part, granted in part, and moot in part.

## II. BACKGROUND

Defendant Tonawanda Coke Corporation ("TCC") and its manager of environmental control, Defendant Mark L. Kamholz, are charged in a 20-count indictment with violating environmental laws and obstructing justice.[1]

TCC is a merchant by-product coke facility that has been in operation since 1978. (Indictment, Docket No. 10, ¶ 1.) Coke is used in the steel-mill and foundry industries as an additive in the steel-making process. (Indictment, ¶ 3.) It is produced through the prolonged heating of bituminous coal in sealed ovens at high temperatures. (Indictment, ¶ 3.) TCC operates 60 coke ovens, each 13 feet in height. (Indictment, ¶ 3.)

---

[1]Count 19 was dismissed on February 4, 2013. (See Docket No. 113.)

1

During the heating process, volatile materials are driven from the coal and removed from the ovens as coke oven gas, which is sent through a by-product recovery system. (Indictment, ¶ 4.) TCC then sells or reuses the recovered by-products. (Indictment, ¶ 4.) One such by-product is coal tar sludge, which TCC reuses by adding it to coal before the coal is loaded into the coke ovens. (Indictment, ¶ 4.) Because of the potential impact coke production has on the environment, the industry is regulated by federal and state statutes and regulations.

Counts 1-15 of the indictment charge Defendants with violating the Clean Air Act ("CAA"), 42 U.S.C. § 7413(c)(1), from 2005 through 2009, by operating a stationary source of air pollution (i.e., TCC) in violation of its CAA permit. In particular, Counts 1-5 charge Defendants with emitting coke oven gas from a pressure relief valve in the by-products department of TCC, which is allegedly an unpermitted emission source. Counts 6-10 charge Defendants with operating the western quench tower (quench tower 1) at TCC without a baffle system.[2] Counts 11-15 charge Defendants with operating the eastern quench tower (quench tower 2) at TCC without a baffle system.

Count 16 of the indictment charges Defendants with obstructing justice, in violation of 18 U.S.C. § 1505, by directing a TCC employee in April 2009 to conceal from EPA inspectors that a pressure relief valve in the by-products department emitted coke oven gas into the atmosphere during normal operations, in violation of TCC's operating permit.

---

[2]Quenching is the process of cooling hot incandescent coke with water. A quench tower is any structure in which hot incandescent coke is deluged or quenched with water. Quenching begins when a quench car enters the quench tower and ends when the quench car exits the tower. Baffles are pollution control devices used to disrupt or deflect particulate emissions rising from the quench tower as a result of the quenching process, and are typically constructed of wood, steel, or plastic. (Indictment, ¶¶ 15, 16.)

Counts 17, 18, and 20 of the indictment charge Defendants with violating the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(d)(2)(A). Count 17 charges Defendants with the unpermitted storage of a hazardous waste adjacent to two large deteriorating tanks, known as the Barrett Tanks, from May 1998 through December 2009. Count 18 charges Defendants with the unpermitted disposal of a hazardous waste originating from in and around the Barrett Tanks, from June 2009 through September 2009. Count 20 charges Defendants with the unpermitted disposal of a hazardous waste by spreading it onto the coal field, from August 2005 through December 2009.

## III. DISCUSSION

**A.     Government's Motions in Limine**

Through its Motions in Limine (Docket Nos. 92, 108), the government requests that this Court grant the following relief: (1) exclude evidence and argument that Defendants' acts did not result in environmental harm; (2) exclude evidence concerning ignorance-of-the-law and entrapment-by-estoppel defenses; (3) exclude evidence and argument concerning a good-faith defense; (4) exclude evidence and argument concerning jury nullification and civil litigation; (5) admit evidence of other crimes, wrongs, or acts under Rule 404(b) of the Federal Rules of Evidence; (6) compel and limit Defendants' use of expert testimony; (7) exclude objections and arguments characterizing testimony of certain lay witnesses as expert opinions or limiting them to summaries; (8) admit testimony of agency witnesses regarding environmental laws, regulations, and permit conditions; and

(9) conduct a partial Daubert[3] hearing.

A majority of the government's requests are now moot.

First, Defendants agree with the government that environmental harm (or lack of environmental harm) is not an element of any of the charged offenses nor relevant to proving the charges in the indictment, except that it may be relevant to related issues, for example, whether certain emissions controls were required. This Court views the parties in agreement that evidence of environmental harm (or lack of environmental harm) will not be directly offered, but may be offered in those limited instances where it may be relevant to a related issue. Objections to the introduction of such evidence in those narrow circumstances, if made, will be resolved at trial.

Second, in response to the government's motion, Defendants represent that they will not pursue (1) an ignorance-of-the-law defense, (2) a good-faith defense, or (3) jury nullification. Defendants also agree not to introduce evidence of the civil litigation pending between the parties. The government's requests in this regard are therefore moot.

Third, this Court issued an order requiring Defendants to disclose their expert witnesses by 5:00 p.m. on February 19, 2013, which they have done. (Docket Nos. 129, 133.) The government's request to compel and limit Defendants' use of expert testimony is therefore moot.

Fourth, at oral argument, the government represented that witnesses it had previously disclosed as both lay and possible expert witnesses would not be called as expert witnesses and would therefore not offer expert opinion testimony. Based on this

---

[3] Referring to the United States Supreme Court's decision in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

4

representation, Defendants withdrew their objections to the government's disclosure and use of these witnesses. The government's request for an order precluding Defendants from objecting to and characterizing the testimony of certain lay witnesses as expert testimony or limiting the government's experts' testimony to summaries is therefore moot.

Finally, Defendants have withdrawn their Daubert challenges to the government's witnesses, thereby rendering the government's request for a limited Daubert hearing moot. (Docket No. 126.)

What remains, then, are the government's requests to (1) exclude evidence of an entrapment-by-estoppel defense; (2) admit evidence of other crimes, wrongs, or acts under Rule 404(b) of the Federal Rules of Evidence; and (3) admit testimony of agency witnesses regarding environmental laws, regulations, and permit conditions. These requests are addressed below, after discussion of Defendants' Motion in Limine.

**B.      Defendants' Motion in Limine**

In their Motion in Limine (Docket No. 88), Defendants seek the following forms of relief: (1) exclude expert testimony concerning legal conclusions; (2) exclude evidence of other crimes, wrongs, and acts under Rule 404(b); (3) preclude the government's lay witnesses from offering expert opinion testimony; (4) preclude Daniel Vollmer from testifying as an expert witness; (5) exclude evidence of a dead deer found at TCC; and (6) preclude the government from using leading questions with its own witnesses.

Like the government's motion, much of Defendants' motion is moot. First, Defendants' request to preclude the government's lay witnesses from offering expert opinion testimony is moot in light of the government's representation at oral argument that

its lay witnesses will not offer such testimony, as discussed above.  Second, the government has withdrawn Daniel Vollmer as a potential expert witness, rendering this portion of Defendants' motion moot.  Finally, this Court advised the parties at oral argument that it would resolve any requests to use leading questions under Rule 611(c) of the Federal Rules of Evidence at trial, rather than by way of a pretrial ruling.

Consequently, the pending requests from Defendants' motion are those to (1) exclude expert testimony concerning legal conclusions; (2) exclude evidence of other crimes, wrongs, and acts under Rule 404(b); and (3) exclude evidence of a dead deer found at TCC.  These requests are discussed below.

**C.    Analysis**

    **1.    Entrapment-By-Estoppel Defense**

Defendants intend to defend the CAA and RCRA counts in the indictment by pursuing an entrapment-by-estoppel defense.  The government seeks to preclude this defense on the basis that it lacks a sufficient evidentiary foundation.

The entrapment-by-estoppel defense is one of two forms of the public-authority defense (the actual-public-authority defense is the other).  United States v. Giffen, 473 F.3d 30, 39 (2d Cir. 2006).  It is available to a defendant when "the government procured the defendant's commission of the illegal acts by leading him to reasonably believe he was authorized to commit them."  Id.

To succeed, a defendant must show that he reasonably relied on the statement or conduct of a government official when he engaged in the conduct with which he is charged. See United States v. Mergen, No. 06-CR-352(NGG), 2010 WL 395974, at *5 (E.D.N.Y.

Feb. 3, 2010) ("Defendant must have reasonably believed he was authorized to engage in the charged conduct at the time he did so."). "For a defendant's reliance to be reasonable, the jury must conclude that a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries." United States v. Abcasis, 45 F.3d 39, 44 (2d Cir. 1995) (quoting United States v. Corso, 20 F.3d 521, 528 (2d Cir. 1994), in turn quoting United States v. Weitzenhoff, 1 F.3d 1523, 1534 (9th Cir. 1993)).

A defendant must also show that he reasonably disclosed the conduct alleged in the indictment to the government before or at the time of authorization. Giffen, 473 F.3d at 42 (finding that the entrapment-by-estoppel defense was not available to the defendant because he failed to disclose the conduct alleged in the indictment). That is, the disclosure and authorization must be linked. Id. (finding that because the defendant failed to apprise government officials of the charged conduct, he could not reasonably have understood the government officials' response as authorization); see also Abcasis, 45 F.3d at 43-44 ("The defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization.").

By way of example, the Second Circuit has explained the entrapment-by-estoppel defense in the controlled substances context as follows:

> If a drug enforcement agent solicits a defendant to engage in otherwise criminal conduct as a cooperating informant, or effectively communicates an assurance that the defendant is acting under authorization, and the defendant, relying thereon, commits forbidden acts in the mistaken but reasonable, good faith belief that he has in fact been authorized to do so as an

7

aid to law enforcement, then estoppel bars conviction.

Abcasis, 45 F.3d at 43-44.

Importantly, for an entrapment-by-estoppel defense, a defendant need not establish that the government *actually* authorized his conduct; he must only show *seeming* authorization. Giffen, 473 F.3d at 41; Mergen, 2010 WL 395974, at *5 ("an entrapment by estoppel defense can be established even if the defendant did not receive actual authorization to engage in the charged conduct"). The focus is on the government's role in leading the defendant to reasonably believe that he was authorized to engage in the acts he is charged with committing. Abcasis, 45 F.3d at 44. The burden is on the defendant to prove the defense. Abcasis, 45 F.3d at 44; United States v. Feneziani, No. 05-CR-290E, 2007 WL 1613630, at *10 (W.D.N.Y. June 1, 2007).

Defendants have a constitutional right to present a complete defense. See Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). Here, Defendants have offered evidence that they disclosed certain conditions charged in the indictment to government officials and that they believed their conduct and methods were authorized. The sampling of evidence includes documents sent by TCC to government officials disclosing the pressure relief valve, testimony concerning open and obvious conditions at TCC related to baffles, and disclosure of coal tar sludge processing to government inspectors.[4] (See Personius Response Declaration, Docket No. 94-1; Personius Sur-Reply Declaration, Docket No. 125.)

In this Court's view, this sampling of evidence provides a sufficient basis to permit

---

[4]This evidence is not fully discussed herein because it has been filed under seal.

Defendants to present and develop their entrapment-by-estoppel defense at trial. Defendants are not required at this stage to prove their defense or demonstrate that the jury will find it credible. See Abcasis, 45 F.3d at 44 ("Once they presented a prima facie defense, the defendants were not required to pass a credibility test to have their defense presented to the jury.") They must show only a sufficient basis to present the defense to the jury, which this Court finds Defendants have done. The government's request to preclude Defendants from offering evidence in support of this defense is therefore denied.[5] See United States v. Hurtado, 47 F.3d 577, 584 (2d Cir. 1995) ("A defense theory must be charged as long as it has some foundation in the proof, no matter how tenuous that defense may appear to the trial court."); United States v. Johnson, 994 F.2d 980, 988 (2d Cir. 1993) ("A criminal defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence.").

Defendants have not, however, established this defense to such a degree that a preliminary instruction to the jury concerning the defense is warranted. Defendants' request for a preliminary instruction is therefore denied. Moreover, this Court finds no basis, at this time, to preclude Defendants from discussing their expected defense in their opening statements, if that is what they elect to do. Defendants are on notice, however, that if the proof at trial is insufficient to support a final instruction to the jury concerning the entrapment-by-estoppel defense, this Court will not give one.

---

[5] It appears that the government now concedes that Defendants are entitled to present their entrapment-by-estoppel defense. (See Government's Response to Defendants' Sur-Reply Declaration, Docket No. 123, p. 2 ("Instead, the Defendants have expressed their intention to develop the entrapment by estoppel defense during the trial, which the government believes they have every right to do.")

## 2. Evidence of Other Crimes, Wrongs, or Acts

The government requests that it be permitted to introduce 13 categories of evidence concerning Defendants' other crimes, wrongs, or acts, as inexplicably intertwined with the substantive evidence or under Rule 404(b). Defendants maintain that the government's true intention is to impermissibly offer this evidence to show Defendants' criminal propensity. They therefore oppose the government's motion and have moved separately to preclude this evidence.

Rule 404 (b) of the Federal Rules of Evidence prohibits the use of propensity evidence. In particular, it states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1); see also Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

But evidence of other crimes, wrongs, or acts may be admissible for some other purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404 (b). Under the Second Circuit's "inclusionary approach," other-act evidence may be admitted for any purpose other than to show a defendant's criminal propensity. United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004).

To be admissible, the Rule 404(b) evidence must be:

(1) offered for a proper purpose (Rule 404(b));

(2) relevant to a disputed issue (Rule 402);

> (3) of probative value that is not substantially outweighed by its prejudicial effect (Rule 403); and
>
> (4) subject to an appropriate limiting instruction to the jury, if requested.

See United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003).

Also relevant is the Second Circuit's approach to certain evidence of uncharged criminal activity. In particular, the Second Circuit has found that "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (citing United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)).

The 13 categories of evidence at issue are as follows:

1. False statements made by Defendant Kamholz in letters and correspondence to the EPA and NYS-DEC regarding the operation of the pressure relief valve and TCC's compliance with its Title V permit;

2. Kamholz's instructions to Pat Cahill to conceal the fact from EPA and NYS-DEC during the April 2009 inspection that during normal business operations, the drip leg valves were open and released COG to the atmosphere;

3. Kamholz's removal of the automatic-igniter for the battery flare stack and instructions to TCC employees to light the flare by setting a broom on fire and throwing it onto the battery;

11

4. NYS-DEC's issuance of a notice of violation relating to the discovery that the flare described above in (3) did not have an automatic igniter;

5. Kamholz's practice of forging the plant superintendent's name on certain records submitted to EPA and NYS-DEC;

6. Kamholz's instructions to dump barrels containing an unknown thick dirty brown oil onto the coal field;

7. TCC's lowering of the back pressure on the collector main prior to Method 303 inspections so as to reduce leaks on doors, manholes, and standpipes;

8. TCC's attempt to hide adjustments to the back pressure setting on the collector main by re-adjusting the pin used to record the setting;

9. Kamholz's insistence to a witness that beehiving (which occurs when the exhauster breaks down and the battery flare stack is opened) never occurred for more than 10 minutes, when in truth, beehiving often occurred for longer than 10 minutes;

10. A 2007 incident in which TCC placed full transformers containing PCB oil into a scrap metal dumpster, and Kamholz's comment to a TCC employee that when he was interviewed by NYS-DEC, he had to do some "fast talking";

11. TCC's practice of not installing the jumper during oven charges which would result in increased emissions to the atmosphere;

12. TCC's failure to notify the fire department of the hazardous nature of the contents of the two tanks that caught fire;

13. Evidence underlying dismissed Count 19 of the indictment.

The government maintains that this evidence is inextricably intertwined with evidence pertaining to the charges in the indictment, and it offers this evidence under Rule 404(b) to show Defendants' intent, plan, absence of mistake or accident, and knowledge. It also offers it to refute Defendants' entrapment-by-estoppel defense. Defendants maintain that this evidence is not inexplicably intertwined with the direct evidence and argues that the government is simply offering it to show criminal propensity.

For categories 1, 2, 3, 4, 7, 8, 9, and 11, this Court finds that the proffered evidence is either inextricably intertwined with the direct, substantive evidence or is admissible under Rule 404(b). For purposes of Rule 404(b), the evidence is offered for a proper purpose to show knowledge of permit requirements and reporting obligations; intent; plan or scheme, particularly a plan or scheme to conceal conditions at TCC; or absence of mistake. Significantly, it is also offered to directly refute Defendants' entrapment-by-estoppel defense, which includes refuting Defendants' claims of full disclosure to government officials. This evidence is relevant to these disputed issues and its probative value is not substantially outweighed by its prejudicial effect. This evidence is therefore admissible, subject to a limiting instruction, if requested.

For categories 5, 6, 10, 12, and 13, this Court finds that the evidence is not offered for a proper purpose, and therefore is not admissible under Rule 404(b).

      a.    **Admissible Categories**

As it pertains to Category 1, this Court finds that evidence of Defendant Kamholz's alleged repeated false statements to the EPA and NYS-DEC through compliance reports and letters is admissible as inexplicably intertwined with the charged offenses, and is

admissible to refute Defendants' entrapment-by-estoppel defense, and to show plan, knowledge, and lack of mistake as it relates to the conduct charged in the indictment.

As it pertains to Category 2, this Court finds that Defendant Kamholz's alleged instructions to TCC employee Pat Cahill to conceal conditions concerning drip leg valves from inspectors is admissible as inexplicably intertwined with the evidence of Count 16 in that it happened at the same time as the conduct charged in that count and involved the same employee, and is admissible to refute Defendants' entrapment-by-estoppel defense, and to show plan, knowledge, and lack of mistake as it relates to the conduct charged in Count 16.

As it pertains to Categories 3 and 4, this Court finds that evidence of Defendant Kamholz's unreported removal of the automatic igniter from the battery flare stack and instructions to TCC employees to instead light the flare stack with an ignited broom is admissible to refute Defendants' entrapment-by-estoppel defense, and to show plan, knowledge, and lack of mistake as it relates to the conduct charged in the indictment. This evidence, however, cannot be used for improper bolstering of the government's witnesses, as suggested in the government's motion papers.

As it pertains to Categories 7, 8, 9, and 11 this Court finds that evidence that Defendants acted to thwart and manipulate independent inspections being conducted by Guardian Environmental Services Inc. and to conceal the truth about "beehiving" and "jumper" practices at TCC is admissible to refute Defendants' entrapment-by-estoppel defense, and to show plan, knowledge, and lack of mistake as it relates to the conduct charged in the indictment.

### b. Inadmissible Categories

As it pertains to Category 5, this Court finds that evidence of Defendant Kamholz's alleged practice of forging the TCC plant superintendent's name on certain records is not admissible under Rule 404(b). The government maintains that the purpose of this evidence is to show that Defendant Kamholz was the sole person responsible for environmental compliance at TCC. There is a disconnect, however, between this stated purpose and Defendant Kamholz's alleged forgeries of the superintendent's signature. This Court therefore finds that this evidence is not relevant, not offered for a proper purpose under Rule 404(b), and in any event, is substantially more prejudicial than probative.

As it pertains to Categories 6 and 10, this Court finds that evidence of Defendant Kamholz's alleged instructions to dump barrels containing an unknown thick dirty brown oil into the coal field and a 2007 incident in which transformers containing PCB oil were placed into scrap-metal dumpsters is not admissible under Rule 404(b). This Court is unpersuaded by the government's argument that the evidence is proper under Rule 404(b) to show Defendant Kamholz's plan and state of mind when talking to inspectors. It appears that these incidents are unrelated to and independent from the conduct charged in the indictment. They are separate and apart from any plan, scheme, or intent relating to the charged conduct. Rather, this is inadmissible propensity evidence, and must therefore be excluded.

As it pertains to Category 12, this Court finds that evidence of Defendants' failure to notify the fire department of the hazardous nature of the contents of two tanks that

caught fire is not necessary to complete the story of the trial nor admissible under Rule 404(b). The government argues that this evidence is inextricably intertwined with the evidence on Counts 17 and 18, and is proper to show Defendants' plan to conceal information from governmental authorities. Defendants' interaction with the fire department, however, is unrelated to the counts in the indictment. And the fire department is not the same type of governmental authority that is at issue in this case. This Court therefore finds that this evidence is not relevant, not offered for a proper purpose under Rule 404(b), and in any event, is substantially more prejudicial than probative.

Finally, as it pertains to Category 13, this Court finds that the evidence underlying dismissed Count 19 is inadmissible under Rule 404(b). In its Motion to Dismiss Count 19 (Docket No. 108), the government stated that dismissal was appropriate "in the interests of justice" after review of the laboratory procedures used to analyze samples from the rail cars at issue. Nonetheless, the government requests that it be permitted to use this very same evidence — which it concedes is inconclusive and suggests by its dismissal of Count 19 is unreliable — under Rule 404(b) to show opportunity, knowledge, intent, and lack of accident or mistake. Entry of this evidence, however, is substantially more prejudicial than probative, particularly in light of the government's dismissal of Count 19, and there is a very real danger that introduction of this evidence will distract the jury and lead to a trial-within-a-trial concerning the conduct underlying dismissed Count 19. This Court therefore finds that this evidence is not offered for a proper purpose under Rule 404(b), and in any event, is substantially more prejudicial than probative. Moreover, the same interests of justice that warranted dismissal of Count 19 warrant excluding this

evidence from the trial.

### 3. Evidence of Environmental Laws, Regulations, and Permit Conditions

Both sides have filed motions seeking to limit the scope of testimony that trial witnesses will be permitted to offer concerning the applicable environmental laws, regulations, regulatory processes, and permit conditions. The government seeks to offer witnesses who will educate the jury on these issues, which are sure to be unfamiliar to the average juror. Defendants' concern, however, is that the government's witnesses will offer expert testimony or testify about their individual opinions about what the law means, as opposed to simply how the regulatory process works. They also fear that the government will elicit opinions from its experts concerning whether Defendants are guilty.

As this Court signaled at oral argument, no witness will be permitted to testify about what the law is or what disputed provisions of laws or regulations mean, since that is the province of the court. To that end, this Court has already required counsel to submit proposed definitions for two terms — land disposal and active management — for this Court to use with the jury. The jury will be informed of the meanings of these and any other disputed legal terms by this Court, not by any trial witness. But testimony concerning the regulatory process, how permitting works, the tangential environmental laws and regulations, and other related concepts will be permitted from both sides to educate, orient, and provide context for the jury.

As for Defendants' request that the government be precluded from eliciting from its experts whether Defendants are guilty, that request is granted. But the government's witnesses may properly testify from their personal knowledge about what Defendants'

permits required and whether the conditions required by the permits were observed at TCC. Those are factual observations, not conclusions of law. It is not impermissible testimony, as Defendants suggest.

Accordingly, the government's request to preclude Defendants from presenting statutes, regulations, policies, and other memoranda concerning disputed issues of law to the jury is granted. Defendants' similar request to preclude the government from offering expert legal opinions is likewise granted. Counsel are on notice that testimony concerning disputed issues of law should not be elicited from trial witnesses.

### 4. Evidence of A Dead Deer Found at TCC

In its trial memorandum (Docket No. 76), the government indicated that it will elicit testimony from several of its witnesses that, in 1998, they observed a dead deer stuck in pooled coal tar sludge around the Barrett Tanks. These witnesses will testify that the deer became trapped in the coal tar sludge, was unable to free itself, and ultimately died there, half-submerged in the coal tar sludge. It is undisputed, however, that the cause of the deer's death is unknown.

Defendants seek an order precluding any evidence of the dead deer and any mention of it in the government's opening or closing statements. Defendants argue that the evidence is irrelevant to the charges in the indictment, would invite speculation concerning the cause of the deer's death, and is otherwise highly inflammatory and unfairly prejudicial. The government argues that evidence concerning the dead deer is part of the "narrative" of its case, explains why coke breeze was spread over the coke tar sludge, and explains why certain witnesses' memories are so vivid after 15 years.

18

Although this Court finds that evidence of the dead deer is relevant in that it may explain why certain actions were taken to cover the coal tar sludge, the evidence is highly inflammatory and unfairly prejudicial. This evidence is not necessary to complete the government's narrative, nor is it necessary to prove the charges in the indictment. In fact, witnesses allegedly saw the dead deer *before* the conduct charged in Count 17 took place. Rather, the evidence is likely to inflame the jurors' emotions, play on their sympathies, or mislead them. Any probative value is most certainly substantially outweighed by these dangers. See FED. R. EVID. 403.

Defendants' request to preclude this evidence is therefore granted and the government is directed not to elicit testimony concerning the dead deer from its witnesses. This Court will revisit this ruling if Defendants open the door by specifically challenging the relevant witnesses' recollections or offering conflicting accounts of what prompted Defendant Kamholz to spread coke breeze over the coal tar sludge.

## IV. CONCLUSION

For the reasons stated above, the parties' Motions in Limine are granted in part, denied in part, and moot in part, consistent with the foregoing decision.

## V. ORDERS

IT HEREBY IS ORDERED, that the government's Motions in Limine (Docket Nos. 92, 108) are granted in part, denied in part, and moot in part, consistent with the foregoing decision.

FURTHER, that Defendants' Motion in Limine (Docket No. 88) is granted in part, denied in part, and moot in part, consistent with the foregoing decision.

SO ORDERED.

Dated: February 22, 2013
Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
Chief Judge
United States District Court