UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                          **DECISION AND ORDER**
                                                            10-CR-219S
TONAWANDA COKE CORPORATION and
MARK L. KAMHOLZ,

                    Defendants.

## I. INTRODUCTION

On March 28, 2013, a jury convicted Defendant Tonawanda Coke Corporation ("TCC") and its manager of environmental control, Defendant Mark L. Kamholz, of violating environmental laws. The jury also convicted Kamholz of obstructing the proper administration of law. Defendants now move for judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or, alternatively, for a new trial pursuant to Rule 33. For the reasons discussed below, Defendants' motion is denied.

## II. BACKGROUND

TCC is a merchant by-product coke facility that has been in operation since 1978. Coke is used in the steel-mill and foundry industries as an additive in the steel-making process. It is produced through the prolonged heating of bituminous coal in sealed ovens at high temperatures. During the heating process, volatile materials are driven from the coal and removed from the ovens as coke oven gas, which is then sent through a by-product recovery system and reused or sold. One by-product of coke oven gas is coal tar sludge, which can be reused by adding it to coal before the coal is loaded into the coke ovens. Because of the potential impact coke production has on the environment, the

1

industry is regulated by federal and state statutes and regulations.

On July 29, 2010, a federal grand jury returned a 20-count indictment against TCC and Kamholz, charging them with committing environmental crimes and obstructing justice in the course of operating the coke facility. (Docket No. 10.) Upon the government's motion, this Court dismissed Count 19 before trial pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure. (Docket No. 113.) The redacted trial indictment therefore consisted of 19 counts. (Docket No. 191.)

Counts 1-15 of the trial indictment charged Defendants with violating the Clean Air Act ("CAA"), 42 U.S.C. § 7413(c)(1), from 2005 through 2009, by operating a stationary source of air pollution (i.e., TCC) in violation of its CAA permit. In particular, Counts 1-5 charged Defendants with emitting coke oven gas from a pressure relief valve in the by-products department at TCC. Counts 6-10 charged Defendants with operating the western quench tower (quench tower 1) at TCC without a baffle system.[1] Counts 11-15 charged Defendants with operating the eastern quench tower (quench tower 2) at TCC without a baffle system.

Count 16 of the trial indictment charged Defendants with obstructing the proper administration of law, in violation of 18 U.S.C. § 1505, by directing a TCC employee in April 2009 to conceal from EPA inspectors that a pressure relief valve in the by-products department emitted coke oven gas into the atmosphere during normal operations, in violation of TCC's operating permit.

---

[1] Quenching is the process of cooling hot incandescent coke with water. A quench tower is any structure in which hot incandescent coke is deluged or quenched with water. Quenching begins when a quench car enters the quench tower and ends when it exits. Baffles are pollution control devices used to disrupt or deflect particulate emissions rising from the quench tower as a result of the quenching process, and are typically constructed of wood, steel, or plastic.

Counts 17, 18, and 19 of the trial indictment charged Defendants with violating the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(d)(2)(A). Count 17 charged Defendants with the unpermitted storage of a hazardous waste adjacent to two large deteriorating tanks, known as the Barrett Tanks, from May 1998 through December 2009. Count 18 charged Defendants with the unpermitted disposal of a hazardous waste originating in and around the Barrett Tanks, from June 2009 through September 2009. Count 19 charged Defendants with the unpermitted disposal of a hazardous waste by spreading it onto the coal field, from August 2005 through December 2009.

Trial began on February 26, 2013, and concluded on March 28, 2013. Upon the close of the government's proof, this Court denied Defendants' Rule 29 motions. (Docket No. 178.) Defendants then presented a defense case and the government presented a brief rebuttal witness. The jury subsequently found TCC and Kamholz guilty on Counts 1-5, 9, 11-15, and 17-19. (Docket No. 192.) It acquitted TCC on Count 16, but found Kamholz guilty of that charge. (Id.) It also acquitted both TCC and Kamholz on Counts 6-8 and 10. (Id.) Following the verdict, Defendants filed the instant motion for judgments of acquittal or, alternatively, for a new trial.

### III. DISCUSSION

**A.** **Defendants' Rule 29 Motion**

    **1.** **Rule 29 of the Federal Rules of Criminal Procedure**

Under Rule 29 (a), a court must, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant may move for a judgment of acquittal after the government closes its evidence,

3

after the close of all evidence, or after the jury has returned its verdict and been discharged.  See Rule 29 (a) and (c)(1).  A defendant may also renew a previously denied Rule 29 motion, so long as renewal occurs within 14 days after the guilty verdict or discharge of the jury, whichever is later.  See Rule 29 (c)(1).

The making of a motion for a judgment of acquittal before the court submits the case to the jury is not a prerequisite for making such a motion after the jury is discharged.  See Rule 29 (c)(3).  "[W]hen a motion for judgment of acquittal made at the close of the government's case-in-chief is denied and a defendant presents a case, then the evidence put in by the defense will also be considered in deciding a [Rule 29] motion made after the trial ends."  United States v. Truman, 762 F. Supp. 2d 437, 445 (N.D.N.Y. 2011).

A defendant challenging the sufficiency of the evidence bears a heavy burden.  United States v. Hassan, 578 F.3d 108, 126 (2d Cir. 2008); United States v. Finley, 245 F.3d 199, 202 (2d Cir. 2001).  "In evaluating whether the evidence was sufficient to convict a defendant, [a reviewing court] consider[s] all of the evidence, both direct and circumstantial, 'in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.'"  United States v. Velasquez, 271 F.3d 364, 370 (2d Cir. 2001) (quoting United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999)).

When considering the trial evidence, "the court must be careful to avoid usurping the role of the jury."  United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003).  The court may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks and citations omitted).  Determining

the witnesses' credibility falls strictly within the province of the jury. Guadagna, 183 F.3d at 129 (noting that the court must defer to the jury even if the evidence would also support, in the court's opinion, a different result).

A judgment of acquittal is warranted only if the court concludes that the evidence is non-existent or so meager that no rational trier of fact could find the defendant guilty beyond a reasonable doubt. Velasquez, 271 F.3d at 270; Guadagna, 183 F.3d at 130. The court must consider the evidence "in its totality, not in isolation, and the government need not negate every possible theory of innocence." United States v. Cote, 544 F.3d 88, 98 (2d Cir. 2008); see Guadagna, 183 F.3d at 130 ("each fact may gain color from the others").

**2. Clean Air Act Counts**

**a. Counts 1-5**

Defendants maintain that they are entitled to a judgment of acquittal on Counts 1-5 because no reasonable juror could have found that Condition 4 of TCC's Title V operating permit applied to operation of the pressure relief valve in the by-products area. Specifically, Defendants argue that the pressure relief valve is an emission "point," not an emission "source."

Counts 1-5 charged Defendants with violating TCC's Title V permit requirements "by emitting coke oven gas from a pressure relief valve in the by-products department, an unpermitted emission source." Consistent with New York law, this Court instructed the jury that "emission source" is defined as any apparatus, contrivance, or machine capable of causing emission of any air contaminant to the outdoor atmosphere, including any

5

appurtenant exhaust system, air cleaning device. 6 NYCRR 200.1(f). It further instructed the jury that "emission point" is defined as any conduit, chimney, duct, vent, flue, stack, or opening of any kind through which air contaminants are emitted to the outdoor atmosphere. 6 NYCRR 200.1(t).

Whether the pressure relief valve is an "emission source" or "emission point" is a question of fact for the jury. By its verdict, the jury concluded that the pressure relief valve was an "emission source." This is a reasonable determination supported by the trial evidence. Two of the government's expert witnesses — Al Carlacci and Larry Sitzman — testified that the terms "emission source" and "emission point" are synonymous and often used interchangeably. Carlacci also testified that Defendants' operation of the pressure relief valve violated TCC's Title V permit, the fair inference being that the pressure relief valve was an "emission source."

Defendants also argue that they are entitled to a judgment of acquittal on Counts 1-5 because there was insufficient proof that the pressure relief valve was subject to permitting requirements at the time it was constructed or modified. Defendants maintain that the government failed to offer evidence concerning the dates of construction or modification of the pressure relief valve, yet they concede that Sitzman testified that the pressure relief valve was a "process" that was modified each time it was adjusted, such that condition 4 of the Title V permit would apply. Defendants' argument also fails to consider that several witnesses testified that the pressure relief valve had been in a different location before the current pressure relief valve was constructed. This testimony, along with the testimony establishing that the pressure relief valve was occasionally adjusted such that it was modified consistent with Sitzman's testimony, supports the jury's
6

verdict that Defendants violated the Title V permit.

Consequently, viewing all of the evidence in the government's favor, this Court finds that the evidence was sufficient to sustain the convictions on Counts 1-5.

      **b.**      **Count 9**

Defendants maintain that they are entitled to a judgment of acquittal on Count 9 because the indictment failed to allege a necessary element of the offense, that being that Defendants operated quench tower 1 in non-compliance with any applicable exemption. The government maintains that the indictment properly charged the elements of the offense.

The elements of 42 U.S.C. § 7413(c)(1) do not include non-compliance with an exemption. Rather, one of the elements is that a defendant operated or caused to be operated an emission source in violation of a Title V operating permit requirement. See 42 U.S.C. § 7413(c)(1). On this point, the indictment charged Defendants with violating Condition 96 of TCC's Title V permit. At trial, Carlacci and Sitzman testified that TCC's use of quench tower 1 10% or more of the time would violate Condition 96, because that would exceed the parameters of the exemption. By its verdict, the jury credited the testimony and evidence that TCC operated quench tower 1 10% or more of the time, thereby finding that the exemption did not apply.

Because the facts of this particular case involve the existence of an exemption, the government was required to prove that the exemption did not apply in order to prove the third element that TCC operated quench tower 1 in violation of its Title V operating permit. There is no requirement, however, that the indictment separately allege that TCC operated quench tower 1 in non-compliance with an exemption because that issue is subsumed in

the third element.  Although Defendants correctly note that this Court specifically instructed the jury that it was required to find that the exemption did not apply to convict Defendants on Count 9, that instruction is specific to this case and was included to guide the jury through the proof as it related to the third element of Count 9.  The inclusion of this instruction does not render the indictment defective or entitle Defendants to judgments of acquittal.

### 3. Obstruction Count

Defendant Mark Kamholz maintains that he is entitled to judgment of acquittal on Count 16, which charged him with obstructing the proper administration of law during a pending proceeding before the United States Environmental Protection Agency, in violation of 18 U.S.C. § 1505.  The evidence at trial revealed that Kamholz told TCC by-products foreman Pat Cahill to conceal from inspectors that the pressure relief valve emitted coke oven gas during normal operations.  Kamholz does not challenge the sufficiency of the evidence or that the EPA investigation constitutes a "proceeding" under the statute.  Rather, Kamholz argues that the proceeding was not pending at the time he spoke to Cahill.

The evidence at trial established that the EPA emailed Kamholz a letter on April 8, 2009, which advised that the EPA would be inspecting TCC the following week.  The subject of the letter was "Clean Air Act (CAA) Compliance Investigation at Tonawanda Coke Corporation – Tonawanda, New York."  The letter directed Kamholz to begin obtaining records to be reviewed during the inspection. Cahill testified that Kamholz spoke to him about the pressure relief valve two days later, on April 10, 2009.  EPA conducted the on-site inspection portion of the investigation from April 14-21, 2009.

8

Count 16 alleges that Kamholz obstructed the pending proceeding from on or about April 14, 2009, to on or about April 21, 2009. In pretrial disclosures, the government identified the proceeding as the EPA inspection conducted from April 14-21, 2009. It is undisputed that the conversation between Kamholz and Cahill occurred on April 10, 2009, four days before the on-site EPA inspection.

Kamholz maintains that the proceeding did not become pending until April 14, 2009, the date the on-site inspection began. In this Court's view, Kamholz's position is too narrow and defeats the purpose of the statute. Kamholz was on notice that TCC was under investigation as of April 8, 2009, when he received the letter. The letter instructed Kamholz to gather documents and prepare for an on-site inspection. This was the start of the proceeding. See United States v. Adams, 472 F. Supp.2d 811, 815-18 (W.D.Va. 2007) (finding that a proceeding includes all stages from inception to conclusion).

To find otherwise would allow a party to obstruct a proceeding with impunity in the early stages, before, for example, an on-site inspection. This would defeat the purpose of the statute and result in an untenable result. Kamholz's construction of "pending" is therefore too narrow under § 1505. Consequently, this Court finds that the proceeding was pending as of April 8, 2009.

Kamholz's remaining arguments are unpersuasive. Kamholz's reliance on United States v. Smith is misplaced. 729 F. Supp.1380 (D.D.C. 1990). No proceeding whatsoever was initiated in Smith; the proceeding was merely imminent. Here, the April 8, 2009 letter initiated the proceeding. It was therefore pending on April 10, 2009, when Kamholz spoke to Cahill. Further, Kamholz's characterization of the April 8, 2009 letter as simply notifying Kamholz of the planned start date of the inspection ignores that the EPA

directed him to begin gathering documents as part of the investigation and inspection. It was not simply bare notice.

Finally, the government's pretrial identification of the proceeding is not conclusive. Although the government identified the proceeding as the inspection conducted from April 14-21, it also stated that Kamholz's instruction to Cahill — the statement that formed the basis of Count 16 — was made a couple of days to a week before the inspection. These disclosures were made as part of the government's memorialization of a conversation with counsel. Although perhaps imprecisely drafted, it does not appear from this correspondence that the government intended to limit the proceeding to April 14-21, particularly given the reference to Kamholz's instruction falling outside of that time period. This is consistent with the indictment, which charged that Kamholz acted "on or about" April 14, 2009, to obstruct the proceeding, which would include April 8, 2009. See United States v. McGee, 564 F.3d 136, 142 (2d Cir. 2009) ("Where an indictment charges an offense using the 'on or about' formulation to allege the date, the government is not required to prove that the crime occurred on exactly the date named, but only that it occurred on a date that is 'reasonably near' to the date stated.").

Consequently, Kamholz's motion for judgment of acquittal is denied as to Count 16.

### 4. RCRA Counts

#### a. Count 17

Defendants maintain that they are entitled to a judgment of acquittal on Count 17 because this Court failed to specifically instruct the jurors that they must unanimously agree on what conduct constituted "active management" to convict. This argument has no

merit. First, this Court repeatedly instructed the jury that its verdict must be unanimous in all respects, both throughout the trial and during the final instructions. Second, the jury verdict form itself explicitly instructed the jury that its responses must be unanimous.[2] Third, any ambiguity Defendants perceive in the jury's verdict is cured by the jury's explicit finding that Defendants violated the law every day between May 31, 1998, and December 17, 2009, further indicating its unanimous findings concerning active management.

Finally, although Defendants rely on Apprendi v. United States, they do not explain why Apprendi requires a separate unanimity instruction under these circumstances, nor can this Court glean such a requirement from that case. 530 U.S. 266, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). To the contrary, the Second Circuit holds that in circumstances where multiple predicates for guilt are offered, "as long as the jury receives a standard instruction as to unanimity, it is not reversible error if a trial judge fails to charge the jury that it must be unanimous as to the specific act that serves as the basis for a guilty verdict." See United States v. Dupre, 462 F.3d 131, 143 (2d Cir. 2006).

Consequently, Defendants' motion for judgments of acquittal is denied as to Count 17.

### b.     Counts 18 and 19

Defendants maintain that they are entitled to judgments of acquittal on Counts 18

---

[2]The preamble to the jury verdict form states as follows:

> Having been instructed on the law applicable to this case, you are now required to *make a unanimous finding of guilty or not guilty* as to the counts charged. Follow the directions on this form carefully. Your answers to the questions on this form *must be unanimous*. Any finding of guilt must be based on findings beyond a reasonable doubt.

See Docket No. 192 (emphasis added).

11

and 19 under the law-of-the-case doctrine because this Court failed to instruct the jurors that a necessary element of the RCRA offenses charged was an "intent to dispose" of the materials at issue. Defendants also maintain that they are entitled to judgments of acquittal on Count 18 because the government offered no meaningful rebuttal to their estoppel-by-entrapment defense.

### i. Intent to Dispose

Defendants, relying on the law-of-the-case doctrine, argue that this Court erred by failing to instruct the jury that a finding of "intent to dispose" was required to convict on Counts 18 and 19. Notably, Defendants do not argue that the instruction given at trial was legally erroneous. Rather, they argue that a pretrial Report and Recommendation by the Magistrate Judge (Docket No. 48), which this Court adopted (Docket No. 54), created an "intent to dispose" element under the law-of-the-case doctrine that should have been charged to the jury.

Defendants misread the Report and Recommendation. They assert that by adopting the Report and Recommendation, this Court held that "land disposal turns on a determination of the defendant's intent, specifically, whether the defendant intended to dispose of the material." But a close reading of the Report and Recommendation reveals that the Magistrate Judge was discussing Defendants' *arguments*, not resolving any issue on the merits: "Notably, *the defendant's argument* turns on a determination of the defendant's intent, specifically, whether the defendant intended to dispose of the material." (Docket No. 48, p. 17 (emphasis added)).

In addressing whether that argument served as a basis for dismissal, the Magistrate Judge found that any issues of intent would fall within the province of the jury. (Docket No.

48, p. 18.) In other words, even accepting Defendants' argument that the jury must find intent, that argument would not serve as a basis to dismiss the indictment because it was a question of fact for the jury. Nowhere in the Report and Recommendation or this Court's Order adopting it is there a *holding* that the jury must be instructed that it must find that Defendants intended to dispose of the materials at issue in Counts 18 and 19 to convict. The law-of-the-case doctrine therefore does not apply.[3]

### ii. Entrapment-by-Estoppel Defense

At Defendants' request, this Court instructed the jury on Defendants' affirmative defense of entrapment-by-estoppel. See Docket No. 138. The instruction to the jury was as follows:

> THE ENTRAPMENT-BY-ESTOPPEL DEFENSE IS AVAILABLE TO DEFENDANTS WHO CAN ESTABLISH BY A PREPONDERANCE OF THE EVIDENCE THAT THE GOVERNMENT PROCURED THEIR COMMISSION OF THE ILLEGAL ACTS BY LEADING THEM TO REASONABLY BELIEVE THAT THEY WERE AUTHORIZED TO COMMIT THEM. IT IS A DEFENSE TO THE CLEAN AIR ACT VIOLATIONS — COUNTS 1-15 — THAT I HAVE JUST DISCUSSED WITH YOU.
>
> THE ENTRAPMENT-BY-ESTOPPEL DEFENSE DOES NOT NEGATE ANY OF THE STATUTORY ELEMENTS OF A CRIME. RATHER, THE ENTRAPMENT-BY-ESTOPPEL DEFENSE RECOGNIZES THAT EVEN THOUGH THE GOVERNMENT MAY HAVE PROVED ALL OF THE ELEMENTS OF A CRIME, TO CONVICT THE DEFENDANT FOR ACTS COMMITTED IN REASONABLE RELIANCE ON A GOVERNMENT OFFICIALS' STATEMENTS OR ON THE CONDUCT OF THE GOVERNMENT WOULD VIOLATE DUE

---

[3]In a footnote, Defendants maintain that they are also entitled to judgments of acquittal because this Court's instruction concerning the definitions of "land disposal" and "active management" was erroneous for the reasons Defendants asserted at trial. Defendants' arguments are rejected for the reasons stated in this Court's previous Decision and Order resolving that issue. (Docket No. 146.)

13

PROCESS OR FUNDAMENTAL FAIRNESS.

TO ESTABLISH THIS DEFENSE, THE DEFENDANTS MUST SHOW THAT THEY REASONABLY RELIED ON THE STATEMENT OR CONDUCT OF A GOVERNMENT OFFICIAL WHEN THEY ENGAGED IN THE CONDUCT WITH WHICH THEY ARE CHARGED. RELIANCE IS REASONABLE IF A PERSON SINCERELY DESIROUS OF OBEYING THE LAW WOULD HAVE ACCEPTED THE STATEMENT OR CONDUCT OF THE GOVERNMENT OFFICIAL AS TRUE AND WOULD NOT HAVE BEEN PUT ON NOTICE TO MAKE FURTHER INQUIRIES OF HIS OWN.

THE DEFENDANTS MUST ALSO SHOW THAT THEY REASONABLY DISCLOSED THE CONDUCT ALLEGED IN THE INDICTMENT TO THE GOVERNMENT BEFORE OR AT THE TIME OF AUTHORIZATION. THAT IS, YOU MUST FIND A CONNECTION BETWEEN THE CONDUCT DISCLOSED BY THE DEFENDANTS AND THE CONDUCT THAT THE GOVERNMENT PURPORTEDLY AUTHORIZED.

FINALLY, THE DEFENDANTS NEED NOT ESTABLISH THAT THE GOVERNMENT ACTUALLY AUTHORIZED THEIR CONDUCT. THEY MUST ONLY ESTABLISH SEEMING AUTHORIZATION. ACTUAL AUTHORIZATION IS NOT REQUIRED.

THE BURDEN IS ON THE DEFENDANTS TO PROVE THE ENTRAPMENT-BY-ESTOPPEL DEFENSE BY A PREPONDERANCE OF THE EVIDENCE.

. . .

I PREVIOUSLY INSTRUCTED YOU ABOUT THE ENTRAPMENT-BY-ESTOPPEL DEFENSE WHEN WE DISCUSSED COUNTS 1-15 OF THE INDICTMENT.

TO REFRESH YOUR RECOLLECTION, THE ENTRAPMENT-BY-ESTOPPEL DEFENSE IS AVAILABLE TO DEFENDANTS WHO CAN ESTABLISH BY A PREPONDERANCE OF THE EVIDENCE THAT THE GOVERNMENT PROCURED THEIR COMMISSION OF THE ILLEGAL ACTS BY LEADING THEM TO REASONABLY BELIEVE THAT THEY WERE AUTHORIZED TO COMMIT THEM. THE DEFENDANTS HAVE THE BURDEN OF PROVING THE ENTRAPMENT-BY-

> ESTOPPEL DEFENSE BY A PREPONDERANCE OF THE EVIDENCE, WHICH MEANS THAT IT IS MORE LIKELY THAN NOT TRUE.
>
> I NOW INSTRUCT YOU THAT ENTRAPMENT-BY-ESTOPPEL IS ALSO A DEFENSE TO THE RESOURCE CONSERVATION AND RECOVERY ACT VIOLATIONS — COUNTS 17-19 — THAT I HAVE JUST DISCUSSED WITH YOU.
>
> I WILL NOT REPEAT MY PREVIOUS INSTRUCTIONS, BUT I SPECIFICALLY INSTRUCT YOU THAT THE INSTRUCTIONS I PREVIOUSLY GAVE YOU CONCERNING THE ENTRAPMENT-BY-ESTOPPEL DEFENSE AND THE PREPONDERANCE OF THE EVIDENCE STANDARD APPLY EQUALLY TO COUNTS 17-19.[4]

Defendants now argue that no reasonable juror could have failed to credit their entrapment-by-estoppel defense as it relates to Count 18

Count 18 charged Defendants with knowingly disposing or causing to be disposed a waste exhibiting the toxicity characteristic for benzene around the Barrett Tanks between in or about June 2009 and September 17, 2009, without a RCRA permit. Defendants assert that Kamholz disclosed TCC's plan to recycle the material into the coke ovens to Thomas Corbett, a NYS DEC inspector, during an inspection on June 17, 2009, and again in September 2009. Defendants view Corbett's testimony as establishing that Kamholz fully disclosed TCC's recycling plan to the inspectors and that they seemingly authorized it. The government takes a different view, arguing that Kamholz failed to fully disclose to Corbett that the material would be placed on the ground during the recycling process.

It bears repeating that when considering the trial evidence, "the court must be

---

[4] This instruction was derived from this Court's previous decision concerning the entrapment-by-estoppel defense. See Docket No. 138.

careful to avoid usurping the role of the jury," Jackson, 335 F.3d at 180, and may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury," Guadagna, 183 F.3d at 130 (quotation marks and citations omitted). It must also avoid disturbing the jury's credibility findings and replacing the jury's view of the evidence with its own. Id. at 129.

Mindful of the jury's due province, this Court has reviewed Corbett's testimony. It is not as definitive as Defendants suggest. On direct examination, Corbett first testified that Kamholz told him during an inspection in June 2009 that TCC planned to recycle the material at issue back into the coal ovens, but did not say where the mixing of the material would occur. Later in his direct testimony and on cross-examination, Corbett testified that Kamholz stated that the material was being recycled by placing it in the coal fields to be mixed with coal to go in the coke oven batteries and that the recycling was physically done in the coal field. In Corbett's view, this violated the RCRA, but he did not inform Kamholz of his opinion because he was working on a team and the team decided to further investigate.

Corbett further testified on direct examination that Kamholz was "a little apprehensive" when investigators returned in September 2009 to sample the material for testing. Corbett told Kamholz that they were testing the sample in relation to how TCC was physically recycling the material, but did not indicate that there was an issue at that time with what TCC was doing, although Corbett still personally believed that TCC was violating the RCRA.

Corbett testified that it was not until sometime after the September 2009 inspection that the inspection team collectively concluded that TCC's recycling method of placing the

16

material directly on the coal fields violated the EPA guidance that prohibited that type of material from being recycled on the ground. Corbett also testified that the inspection team never approved TCC's recycling activities during their inspections, nor, conversely, did they caution them that their activities may violate the RCRA.

As reflected in the jury instruction, Defendants' affirmative defense is fact-driven. The jury heard Corbett's testimony on both direct and cross examination. By its verdict, the jury was not satisfied that Defendants established their entrapment-by-estoppel defense. Although Defendants focus primarily on the evidence demonstrating that Kamholz disclosed TCC's recycling plan to Corbett and the investigation team, full disclosure is not the only element of the defense. The jury could have rejected the entrapment-by-estoppel defense for lack of full disclosure, an absence of reasonable reliance, or failure to demonstrate seeming authorization.

While Corbett's testimony tends to support a finding of full disclosure by Kamholz, the same cannot be said as to reasonable reliance and seeming authorization. The investigators investigated. They did not approve of TCC's recycling operation, nor did they disprove of it. They were gathering information and Corbett told Kamholz in September 2009 that they were testing the material in relation to how TCC was recycling it. The jury could reasonably have determined, under these inconclusive circumstances, that any reliance on the investigators' silence by TCC was not reasonable, nor could it serve as seeming authorization. Such a determination would be supported by the evidence at trial.

Accordingly, viewing the evidence in the government's favor, and respecting the jury's province to freely weigh the evidence and determine credibility, this Court finds sufficient evidence in the record from which the jury could have concluded that Defendants'

17

affirmative defense failed.  Defendants' motion for judgments of acquittal on this basis is therefore denied.

**B.**     **Defendants' Rule 33 Motion**

Rule 33 of the Federal Rules of Criminal Procedure provides that a court may grant a motion for a new trial "if the interest of justice so requires."  A district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and only in 'the most extraordinary circumstances.'"  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir.2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir.1992)).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be manifest injustice . . . .  There must be a real concern that an innocent person may have been convicted."  Ferguson, 246 F.3d at 134.  A reviewing court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict.  Sanchez, 969 F.2d at 1414 (internal quotation marks omitted).

Defendants maintain that they are entitled to a new trial because this Court failed to properly instruct the jurors on how to consider the entrapment-by-estoppel defense, either through an additional instruction or by requiring the jury to complete a specific interrogatory for each count with respect to whether Defendants sustained their burden of proving the affirmative defense.  But other than attempting to draw a parallel to a case involving a self-defense instruction, see United States v. Bell, 584 F.3d 487 (2d Cir. 2009), Defendants point to no authority requiring the level of jury guidance they advocate.

In Bell, the district court instructed the jury that "it may be helpful for you to resolve this question [of self-defense] at the outset of your deliberations."  584 F.3d at 485.  By its

18

plain terms, this was not a directive to the jury, but rather, a suggested method of how to proceed. In reviewing this charge, the Second Circuit noted that it sufficiently emphasized the issue of self-defense. Id. The court did not, however, find that such a charge was required to properly address the affirmative defense, since that was not the issue before it.

Here, this Court placed proper emphasis on Defendants' entrapment-by-estoppel defense. This Court's instruction was complete and comprehensive, exceeding in scope and specificity a similar entrapment-by-estoppel instruction approved by the Second Circuit. See United States v. George, 386 F.3d 383, 397 (2d Cir. 2004). Moreover, this Court delivered the affirmative defense instruction at two separate points during the charge to the jury. No further charge or suggestion on how to proceed in deliberations was required, and, in fact, more could possibly have impermissibly encroached on the jury's independent deliberative function. Further, no special interrogatories were required, particularly given the "historical preference for general verdicts," and the "traditional distaste for special interrogatories" in criminal cases. United States v. Coonan, 839 F.2d 886, 891 (2d Cir. 1988). And certainly, under no formulation does the lack of an additional instruction or special interrogatories constitute a manifest injustice or give rise to a real concern that an innocent person may have been convicted. See Ferguson, 246 F.3d at 134.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Judgments of Acquittal, or in the alternative, for a New Trial is denied.

## V. ORDER

IT HEREBY IS ORDERED, that Defendants' Motion for Judgments of Acquittal, or in the alternative, for a New Trial (Docket No. 197) is DENIED.

SO ORDERED.

Dated: March 13, 2014
        Buffalo, New York

                                          /s/William M. Skretny
                                          WILLIAM M. SKRETNY
                                          Chief Judge
                                          United States District Court